Appeal number 24-2033. We welcome Mr. Baker to the podium. Thank you, Your Honor. May it please the court, counsel. My name is John Baker and I'm here today asking that this court reverse a grant of summary judgment against my three correctional officer clients. This court has repeatedly recognized that prisons are inherently dangerous places. Dangerous places need rules. Those rules need to be followed. When those rules are not followed, things happen. People get hurt. Correctional officers, inmates. In order to properly do their jobs, correctional officers have to know what the rules are. And when they have those rules, and when they follow them, Monday morning quarterbacking offends the notion of due process. This is what this court referred to in advance as when you are asking someone to engage in guesswork as to whether their actions violate policies or procedures, due process is violated. Now here we have two separate types of issues. All three of my clients were involved in this same incident involving a problematic prisoner. In the charges against them, there were four separate things that they alleged as it related to the actual incident itself. The secondary part are the reports, but I want to focus on the incident itself. They identify these things, they throw out a few generalized policies, and they say this conduct was unprofessional and unbecoming. So the four things that they allege is that there was never an attempt to de-escalate the situation prior to entering the cell. Now there's zero evidence of that whatsoever that there was no attempt to de-escalate it. Hundley testified repeatedly that what was done. The others testified. There were two other correctional officers involved. They all testified as to what was done. There was nothing ever to contradict that evidence. The Department of Corrections, the defendants could never identify what they should have done to de-escalate it that they didn't do. The second thing... Can we clear something up from the get-go? Yes, Judge Rodner. We're here to consider the vagueness of the use-of-force rule. You know, the brief spent so much time discussing whether the officers violated rules about entering cells or calling supervisors or leaving one handcuffs, but aren't those all matters for the Employee Review Board? You know, we are not, federal courts are not in the business of figuring out whether employees broke rules or employers misinterpreted rules. We're here, you know, to adjudicate a constitutional question. So isn't the only question here whether a rule that says do not use force except as a last resort is so vague that no reasonable officer could follow it. So I need to know what is vague about a rule that says do not use force except as a last resort. Well, Judge Rodner, again, and I believe, and just so I can understand your question, when you say the Employee Review Board, are you talking about the internal administrative or are you talking about the subsequent Civil Service Commission appeal? Well, we can look at both, actually. Well, as it relates to the Civil Service Commission appeal, there's never been an argument before the district court that that somehow is what should be relied upon. So I do believe the earlier, your question is, the appropriate question is, based on the decision that was made by the internal administration of whether policies were violated, yeah, I think that in general, the concept of use of force is a reasonable policy. The question becomes, though, how it is applied in a particular context. And when you are sort of as an agency, when there are specific rules, not only is the use of force policy easy or not complicated, it's very detailed in when you can and cannot use it. So what happens here is they come up with a number of different ideas of instances that they say are violations of that policy, which if they were, that would be one thing, but they're not. They're creating, effectively creating an entirely new policy, and that's where the problem is. It's not, I apologize, Judge Rodner, I couldn't hear you. I'm sorry. You're fine. Forgive me, but look, is it your contention that there were zero other possible actions that the officers could have taken before they entered the cell to connect Bradley to a lead chain? Well, I don't... Isn't that what last resort means? I mean... Well, first of all, I think you're under the same misapprehension of the district court was under, and if I could explain that. You know, when we talked about this lead chain, all right, in our statement of undisputed facts, we specifically talked about it, and we explained that the going into the going into the cell to apply the lead chain, we explained why that was proper. In response to that, in response to the statement of undisputed facts, the defendants state, defendants do not allege that plaintiffs were improper in using the lead chain, nor that plaintiffs are unfamiliar with the concept of a lead chain. So they have specifically acknowledged that there was nothing improper about them going in and using the lead chain. In fact, that was done repeatedly. Not only that, we have another example involving an officer Merritt, who effectively did exactly the same thing. He tried to call, ask for the tactical team. They refused his request for the tactical team, and so he went in to do the exact same thing, and then the inmate did... You do understand, I take it, that we don't... We can't care about rules violations as such. We are... What we care about here today is the vagueness of this rule. It's the vagueness as it is applied here, and so when they make arguments like, well, not applying the lead chain, or going in to apply a lead chain is inappropriate, well, that's not a rule. So not only is it vague, it doesn't exist. They are just lumping everything into the overall concept of, it is excessive force, or use of force policy violation, when it is not. They repeatedly, throughout their brief, acknowledge over and over again in their admissions, over and over again, that there was no use of force before, until Bradley threw his catheter bag, spit on them, and kicked them, and then he lunged out of his wheelchair at them. That was the very first time that they used force. According to what the admissions are within their summary judgment brief. They've never presented anything to the contrary on that. And so we have to understand here, what are these officers supposed to do? Officers have to have to make split-second decisions. So now we come up with this Monday morning quarterbacking, suggesting, well, they should have done this differently, they should have done that differently. You know, I do appreciate you bringing up the issue of Monday morning quarterbacking. I think you have a point there, that some of that is involved in the analysis here. What's interesting about this case, is that very same notion is brought up in the qualified immunity sphere. Qualified immunity exists, it's, you know, it's a court-created doctrine, judge-made doctrine, to prevent Monday morning quarterbacking. On the other end, yes, it is. Okay. So what is your best argument for us? An analogous case, something that supports your argument that qualified immunity doesn't decide the case here. Okay. Thank you, Judge Jackson-Kuhnmeyer. I think that a couple of the Bents case talks in general, and that's an old case from this court that goes back, I believe, to the 1970s. We saw your arguments about Bents, B-E-N-C-E, right? Yes, yes, Your Honor. Different situation. Well, again, every situation is unique, and I think that the other side has repeatedly harped on this, that, look, that was a First Amendment claim, so therefore, it's different. But the idea is the same. The idea about vagueness, the idea about an employee having to know the rules, those are not, in any case, ever limited to simply the First Amendment sphere. They are much broader than that. Now, can I point to a specific case where there was a use of force, an application of the force? I can't. Okay. So I go back to... And do you have any cases in Illinois where Illinois courts or federal courts have rendered this kind of... Found this kind of use of force policy unconstitutionally vague? I don't know that I've seen a case that finds it that way or one that finds it in any way. I don't know that that... And what about in other states? I mean, I imagine the use of force policy here is not that different from use of force policies in other jurisdictions. I think that's fair. It seems pretty standard for a correctional kind of use of force. No? Yeah, no, no, I agree. I think it's very consistent with what you would find throughout. I also, if I could address one other point about qualified immunity, my understanding of qualified immunity is it's immunity from damages and not necessary other types of relief, and we have sought other types of relief in this case, like reinstatement, and I believe that that would survive a qualified immunity determination. Well, one question I have about that is the use of force policy wasn't the only grounds for termination here. Well, there were... That's correct. The other one was this policy about writing a report, and again... But if you're not challenging that on appeal... We are challenging that on appeal. We have challenged that. The district court said we didn't raise the issue. We argued that we did raise the issue. We are challenging it on appeal, and what you have there is you have a situation where they use the term escort for this individual across the floor, and what this was was this was an individual who had gone limp. He was dead weight at this time, would not move. So we had five officers. There was a previous memorandum saying, you cannot pick this person up, or any person up. You can't pick them up because it's dangerous to staff. That had already been a directive given. We had no wheelchair chair for this sort of a situation. There are chairs that are made for these situations to move... And you're in your rebuttal time, Mr. Baker, unfortunately, so... I am. I'll just take a few seconds more to address this particular point. But ultimately, you had these individuals, I believe it was like 22 feet across that they moved him. It took them 17 seconds. They're moving him very slowly across. As it relates to that term, they used escort. The department says they should have used drag. We asked repeatedly for any documentation that would show that that was inappropriate. We asked the major who actually wrote the segregation policies at that facility, and he testified that escort was the perfect choice of word. My clients all testified they had been trained repeatedly that escort was the right word. And the supervisor who was on duty that day said, if somebody had come in and put a report in that said drag, he would have told them, change it to escort. So again, what are my clients supposed to do? This is what they are told throughout. This is what they know. And again, that's why this is important, and that's why it's Monday morning quarterbacking. I went more than I wanted to, so I'll reserve. Thank you very much. Thank you, Mr. Baker. And Mr. Studer, we welcome you to the podium. Good morning, Your Honors. May it please the Court. I'm John Studer for the Defendant's Appellees. The judgment should be affirmed. There's only one claim remaining in this case, and it alleged that the Department's use of force rules were unconstitutionally vague as the Department defendants applied them to plaintiff's conduct. I think Judge Rovner got this point exactly right. This is not an opportunity for them to re-challenge all the administrative proceedings. There was an investigation performed by the Department. They had a hearing before an employee review board. They appealed the discharge decisions to the Civil Service Commission. The Civil Service Commission gave them a five-day hearing, and then ultimately upheld the discharge decisions. They currently have an administrative proceeding, a challenge in the Circuit Court of Sangamon County that they just have chosen not to advance. So the question of whether the rules were correctly applied and the factual determinations made in the administrative proceedings, Judge Rovner is exactly right. Those belong with the state. This claim is solely about whether this standard was so vague that there was really no standard at all and that they were damaged by the lack of a standard. But as the District Court correctly held, the rules weren't vague. It said force is a last resort. Why would it violate the Department's use of force policy for the officers to simply decide to go into the cell? The policy governs physical contact. So why wouldn't the analysis begin the moment they touched Mr. Bradley, as opposed to what the state wants to talk about, which is their decision to go into the cell? It's not so much the decision to go into the cell. It's the decision to go into the cell to obtain the handcuffs using force. This rule is intended to protect inmates and officers from high-risk situations, which force tends to bring about. So these officers faced a decision point. The inmate was in the cell, refusing to put his hands in the cuffing point. He was being noncompliant. But they had about 20 to 30 minutes before they went into the cell, and they knew they could raise the issue up their chain of command. There's testimony from the supervisor that he would have attempted to de-escalate, and also that he would have sought guidance from the backup warden, who could have called in the tactical team. But instead of choosing that path, which was the path of de-escalation and minimizing risk, they chose to instead get a tactical shield, a six-foot-long chain, and go into the cell. And if you look at the deposition testimony in this case, you have testimony from Huntley saying that when they went into the cell, they were going to attach the chain to Bradley. They were going to move Bradley to the front of the cell. They were going to pull the chain through the cuffing port, shut the door, and then move his hands to the cuffing port. So what we have is an inmate who was not voluntarily placing his hands where they wanted them, and the officers, instead of raising the issue, decided that they would move his hands where they wanted them. I hear you to be arguing two different things, because in your briefs, and here you've said the decision was to go into the cell and use force. So it's kind of like one overarching thing. At summary judgment, you conceded that the officers did not use force until the moment that Mr. Bradley threw his catheter bag at them. So where's the force decision? Is it as you've revealed, it's the moment they decide to go into the cell, or is it later on down the timeline when he throws the bag at them? It's correct that in response, in summary judgment, they said that the officers did not actually apply the force until after the catheter bag was thrown at him. But the issue here is they chose to use force in violation of this rule, and although something happened in the intervening point, they created this high-risk situation. So if you look at the administrative proceedings, for example, when they challenged this before the Civil Service Commission, the commission found that the department had proved by a preponderance of the evidence that there was no risk of injury or destruction of property until they entered the cell to retrieve the handcuffs from Bradley. So we are focused on the decision point, that they chose to use force, went into the cell, and created this high-risk situation rather than the exact moment at which they applied the force. But as the district court correctly noted, it's not unfair to require someone who deliberately goes perilously close to an area of prescribed conduct that they take the risk that they cross the line. So the use of force policy, in your analysis, it really starts before someone uses force. It governs situations where someone creates a high-risk environment. That's actually what the use of force policy also governs? That's more broad than I would state it, Your Honor. I think it governs where they embark on this course of action to apply the force. Well, and that's not in the plain language of the policy, so maybe it is vague. I don't think that it's vague, Your Honor. And I think the way that I would view it, two responses, really. First, from a factual standpoint, standing at that cell door with the officer being noncompliant, I don't think anyone would have a question which path they should take, given the text of the rule. The rule says force is a last resort. So I'm faced with a decision point. I can either go and escalate this up the chain of command, or I can go in and move him where I want him to be. I think that provides the officers plenty of what the right course of conduct is under those situations. It doesn't need to be that specific. And then from a legal standpoint, I would say, I mean, even criminal laws don't require mathematical precision. And when the government is acting as an employer, and here this is a highly unusual case, there's no constitutional right at stake underlying it. It's not a First Amendment case. They've dropped their other constitutional claims. The level of detail required here is at its absolute lowest. And there has not been a single case cited in their briefs. I was unable to find anything remotely similar, where a use of force policy was found to be vague under similar facts. One other point I would like to respond to from Mr. Baker's argument was, he said that in the admissions, in reply and summary judgment that, and I don't want to misquote, but what I believe I heard was that we admitted that the officers were proper in going into the cell to use the lead chain. That misstates or overstates what the admissions were. I believe he was We did not admit that it was proper for them to go and apply the lead chain, try to move the inmate's hands, and so forth. It's just, it's not a dispute about the manner in which the lead chain is used. But we do take issue with the fact that they chose to use force and created a high risk situation by doing so. If there are no further questions from the court, I would ask that the court affirm the judgment of the district court. Okay. Thank you, Mr. Studer. We'll welcome Mr. Baker back, and we can take you up to two minutes. You can thank your friend on the other side there. Thank you, counsel. I appreciate it. And Judge Jackson-Kimme, thank you very much. Again, a couple of things. We can both argue as to what the response to Fact 64 says, but they say it's even immaterial to the argument, to the case, because defendants do not allege that plaintiffs were improper in using the lead chain, nor that plaintiffs are unfamiliar with the concept of a lead chain. So I think that's a pretty broad statement on their part. But more importantly, they've never set a rule that shows that it's improper for someone to go in. And again, we have this whole Merritt case, where it's the same thing, but the officer there calls and says, can we bring in the tactical team? And they say no. And the reason you don't bring in the tactical team is because the tactical team is more dangerous. At least two of the members, two of my clients, were members of the tactical team. When the tactical team is used, pepper spray is immediately shot into an inmate, immediately, once they continue to refuse to comply. The rules say it's proper to go in there. Number one, inmates are not allowed to have their cuffs on when they are in the cell. That is a rule in the segregation manual at Lawrence. Number two, when I asked, and this is on page five of our reply brief, when I asked, the head of security for the department, can you point to any document that says what circumstances it would be inappropriate for a lieutenant to order a cell door open? No. As it relates to the requirement, the lieutenant first contact their command staff before opening the door. You can point to no rule or other document that supports that, can you? No. So, I mean, there's no rule, there's no document. You're dealing with a situation where you have a person in there who is violating the rules. He is not compliant with the rules to release his handcuffs. It is a safety issue. The Department of Corrections ticketed this inmate and shipped him out of there, and they found specifically that it was a violation of the safety and security rules of the facility when he had his handcuffs on and wouldn't relinquish them. So it is, by their own admission, by their own actions, I see that my time is up. I greatly appreciate the extra time that has been given. We ask that the district court's decision be reversed. Thank you all very much. Thank you to both parties. We will take the case under advisement.